UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHUN WING WONG,

    Plaintiff,

v.

    Case No. 05-73922

    Honorable Nancy G. Edmunds

T-MOBILE USA, INC.,

    Defendant.
    _____/

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION [4]**

    Plaintiff Chun Wing Wong brought this proposed class action lawsuit based on Defendant T-Mobile USA's apparent practice of overcharging its cellular telephone customers. As to Plaintiff individually, Defendant wrongfully overcharged only a small sum of money, but overall, Plaintiff alleges, Defendant may have wrongfully reaped millions of dollars from its customers.

    Now before the Court is Defendant's Motion to Compel Arbitration pursuant to the cellular service contract between Plaintiff and Defendant. Importantly, Defendant's contract protects it from any sort of class action, and thus allows Defendant to overcharge its customers without substantial risk of liability.

    For the reasons discussed below, this Court finds that the class action waiver in Defendant's contract is unenforceable. Because the contract prohibits class-wide arbitration, the Court DENIES Defendant's Motion.

**I.     Background**

The facts of this case do not appear to be in serious dispute. In 2003, Plaintiff purchased a cellular telephone from Defendant and the parties entered into a contract. Part of the contract provided that in exchange for a monthly fee of $4.99, Defendant would provide Plaintiff with "unlimited T-Zones," a feature including "unlimited Internet, email and Mobile Web content." Nevertheless, Defendant charged Plaintiff additional fees for use of the internet, email, and mobile phone content. On several occasions, Plaintiff requested a refund of the money. While Defendant concedes that Plaintiff was overcharged in error, Defendant has refused to refund some of the money on account of Plaintiff's failure to object to the charges within the limitations period. Plaintiff notes that while his actual damages are only $19.74, in the aggregate, Defendant "has probably collected millions of dollars improperly." (Br. of Pl. 8.)

The service contract between Plaintiff and Defendant made arbitration of disputes mandatory and contained a class action waiver. In April of 2003, however, a federal district court in California struck Defendant's class action waiver provision and sent the case for class-wide arbitration. *Gatton v. T-Mobile USA, Inc.*, 2003 U.S. Dist. LEXIS 25922 (C.D. Cal. Apr. 18, 2003). Perhaps troubled by the prospect of class-wide arbitration, Defendant revised the arbitration agreement as follows:

> <u>CLASS ACTION WAIVER.</u>  WHETHER IN COURT, SMALL CLAIMS COURT, OR ARBITRATION, YOU AND WE MAY ONLY BRING CLAIMS AGAINST EACH OTHER IN AN INDIVIDUAL CAPACITY AND NOT AS A CLASS REPRESENTATIVE OR A CLASS MEMBER IN A CLASS OR REPRESENTATIVE ACTION. NOTWITHSTANDING SEC. 22, IF A COURT OR ARBITRATOR DETERMINES IN A CLAIM BETWEEN YOU AND US THAT YOUR WAIVER OF ANY ABILITY TO PARTICIPATE IN CLASS OR REPRESENTATIVE ACTIONS IS UNENFORCEABLE UNDER APPLICABLE LAW, THE ARBITRATION AGREEMENT WILL NOT APPLY, AND YOU

> AND WE AGREE THAT SUCH CLAIMS WILL BE RESOLVED BY A COURT OF APPROPRIATE JURISDICTION, OTHER THAN A SMALL CLAIMS COURT.

(Br. of Pl. Ex. 5.) Thus, while arbitration remains the agreed-upon means to resolve the present dispute, the parties have also agreed that if this Court finds the class action waiver unenforceable, the case shall be resolved here, rather than in an arbitral forum.

Plaintiff's Class Action Complaint alleges five causes of action: (I) Violation of the Michigan Consumer Protection Act ("MCPA"), (II) Breach of Contract/Express Warranty, (III) Fraud, (IV) Unjust Enrichment/Restitution/Disgorgement, and (V) Injunctive and Declarative Relief Including Reformation of Contract and for an Accounting.

## II. Discussion

As Plaintiff points out, the first issue before the Court is whether the class action waiver is enforceable. If not, the parties have agreed to settle this dispute in this forum, and the Court need not go further.

Plaintiff argues that the class action waiver is unenforceable as contrary to the explicit policies set forth in the MCPA, which expressly grants the right to bring and participate in class action litigation. Mich. Comp. Laws § 445.911(3). Defendant argues that because the right to class actions is not a *substantive* right, but a procedural one, an arbitration agreement may dispose of this right. Indeed, Defendant notes, "[t]he whole point of arbitration is to provide for a quick, inexpensive resolution by foregoing a whole panoply of procedures available to litigants in court." (Br. of Def. 15.) In any event, Defendant contends, the MCPA does not apply here, since that statute exempts conduct authorized under law, and the federal government regulates the cellular industry.

### A. Class Action Waiver

The Federal Arbitration Act ("FAA"), under which Defendant brings this Motion, provides that the arbitration clause should be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985), the Supreme Court read this statute to encourage the enforcement of arbitration agreements, even where, as here, a plaintiff raises a statutory claim:

> The "liberal federal policy favoring arbitration agreements" . . . is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." "[The] preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered," a concern which "requires that we rigorously enforce agreements to arbitrate." . . . There is no reason to depart from these guidelines where a party bound by an arbitration agreement raises claims founded on statutory rights. . . .
>
> . . .
>
> By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration

*Id.* at 625-28 (internal citations and footnotes omitted). Although the plaintiffs in *Mitsubishi* argued that arbitration would undermine the deterrent purposes of the statutes upon which their lawsuit was based, the Court held that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.* at 637.

In *Rembert v. Ryan's Family Steakhouses, Inc.*, 596 N.W.2d 208 (Mich. Ct. App. 1999), which the parties agree to be a key precedent, the Michigan Court of Appeals relied

4

on the above language from *Mitsubishi* in addressing whether public policy considerations could preclude the arbitration of statutory claims. The court read *Mitsubishi* as follows:

> [T]he Court held that if the parties had agreed to arbitrate statutory claims, the agreement should be enforced unless . . . the agreement foreclosed effective vindication of statutory rights. . . .
>
> [T]he basic rationale . . . is twofold. First the Court endorsed the principle that an agreement to arbitrate a statutory claim does not constitute waiver of substantive rights. Second, the Court recognized that a statute will serve both its remedial and deterrent functions as long as the prospective litigant can vindicate his statutory cause of action in the arbitral forum.

596 N.W.2d at 218-19 (citing *Mitsubishi*, 473 U.S. at 628). Thus, the *Rembert* court held that an arbitration agreement is unenforceable if it "is drafted in a away that effectively waives the plaintiff's substantive rights or remedies or so structures the procedures as to make it impossible for the plaintiff to 'effectively vindicate his statutory cause of action' . . . ." *Id.* at 225 (internal citations omitted).

This reading finds support in a recent First Circuit Court of Appeals case. In *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006), the court issued an exhaustive opinion addressing an arbitration agreement between a cable provider and its customers which prohibited class actions. Although the plaintiffs had brought suit under state and federal antitrust laws, rather than consumer protection laws, the analysis is helpful here.

The *Kristian* court recognized the federal policy favoring arbitration agreements, but also acknowledged an important need for class actions. As the Supreme Court has instructed, "the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). Another court

5

has wisely cautioned that "[t]he realistic alternative to a class action is not 17,000,000 individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.00." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

In light of the importance of class actions, the *Kristian* court stated, "While . . . the class action . . . [i]s a procedure for redressing claims—and not a substantive or statutory right in and of itself—we cannot ignore the substantive implications of this procedural mechanism." 446 F.3d at 54.

> If the class mechanism prohibition here is enforced, Comcast will be essentially shielded from private consumer antitrust enforcement liability, even in cases where it has violated the law. Plaintiffs' will be unable to vindicate their statutory rights. Finally, the social goals of federal and state antitrust laws will be frustrated because of the "enforcement gap" created by the de facto liability shield.

*Id.* at 61. The court concluded that "the provision[] of the arbitration agreements . . . barring class arbitration are invalid because they prevent the vindication of statutory rights under state and federal law." *Id.* at 29.

This Court recognizes that the First Circuit's approach is not universally accepted. As the *Kristian* court noted, the Third, Fourth, Seventh, and Eleventh Circuit Courts of Appeal have enforced class action prohibitions in consumer arbitration clauses. *Id.* at 78-79 (citing *Johnson v. W. Suburban Bank*, 225 F.3d 366, 374 (3d Cir. 2000); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 559 (7th Cir. 2003); *Randolph v. Green Tree Fin. Corp.*, 244 F.3d 814, 819 (11th Cir. 2001)). The Court is not aware of any Sixth Circuit case addressing this precise issue.

Two federal district court cases in Michigan are helpful, however. One recent case holds that the preclusion of class actions does not render an arbitration agreement substantively unconscionable. *Copeland v. Katz*, 2005 U.S. Dist. LEXIS 31042, at *11-12 (E.D. Mich. Nov. 28, 2005). While the question of substantive unconscionability is related, it is distinct from the issue presented here. Moreover, *Copeland* did not involve the MCPA, which expressly provides for class actions.

*Lozada v. Dale Baker Oldsmobile*, 91 F. Supp. 2d 1087 (W.D. Mich. 2000), is more directly on point. In *Lozada*, the court applied *Rembert* to the MCPA and an arbitration agreement including a class action waiver. The court found the class action waiver unenforceable:

> [U]nder the Michigan Consumer Protection Act, the availability of class recovery is explicitly provided for and encouraged by statute. *See* Mich. Comp. Laws § 445.911(3) (expressly permitting aggrieved person to bring class action for claims brought pursuant to the MCPA). Because the arbitration agreement prohibits the pursuit of class relief, it impermissibly waives a state statutory remedy.

*Id.* at 1105 (citing *Rembert*, 596 N.W.2d at 230).

Defendant asks this Court to reject *Lozada*, arguing that it has misinterpreted the holding in *Rembert*:

> What the *Rembert* court in fact held was that, in the context of statutory employment discrimination claims, "the arbitration agreement [must] not waive the *substantive* rights and remedies of the statute. . . ." The right to a class action, however, is not a substantive right or remedy provided by the MCPA (which is not an employment-related statute in any event). Rather, it is a *procedural* right.

(Br. of Def. 14-15.) Defendant reads *Rembert* too narrowly, however, replacing the following critical language with an ellipse: "and the arbitration procedures are fair so that

7

the employee may effectively vindicate his statutory rights." 596 N.W.2d at 226. Despite Defendant's attempt to ignore it, this critical language controls the present case.

Whether the right to a class action is a substantive or a procedural one, it is certainly necessary for the effective vindication of statutory rights, at least under the facts of this case. Defendant makes much of the fact that it contributes toward plaintiffs' arbitration costs, but in order for arbitration to be feasible, the amount at issue must also exceed the value in time and energy required to arbitrate a claim. Defendant is alleged to have bilked its customers out of millions of dollars, though only a few dollars at a time. Plaintiff's damages are a paltry $19.74, hardly enough to make arbitration worthwhile. Class actions were designed for situations just like this. The MCPA's class action mechanism is essential to the effective vindication its statutory cause of action.

### B. MCPA Preemption

The discussion above assumes that Plaintiff has a statutory cause of action, like the plaintiffs in *Rembert*, *Lozada* and *Kristian*. Plaintiff's only statutory claim falls under the MCPA, but Defendant argues that its conduct is exempt from the MCPA. If Defendant is correct, the MCPA would not apply, and the class-action waiver could not run afoul of that statute. In other words, the MCPA would not render the arbitration agreement unenforceable.

The MCPA contains an exemption for a "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). The key Michigan precedent interpreting this provision is *Smith v. Globe Life Insurance Co.*, 597 N.W.2d 28 (Mich. 1999), in which the Michigan Supreme Court concluded that

> when the Legislature said that transactions or conduct "specifically authorized" by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute. Contrary to the "common-sense reading" of this provision by the Court of Appeals, we conclude that the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is "specifically authorized." Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.

*Id.* at 38.

Recently, this Court had occasion to review the MCPA and the implications of the *Smith* case. In *Flanagan v. Altria Group*, 2005 U.S. Dist. LEXIS 24644 (E.D. Mich. Oct. 25, 2005), the plaintiff relied on the MCPA to claim that a cigarette manufacturer had unlawfully misled consumers in its labeling and advertising practices. The defendant, relying on *Smith*, argued that the MCPA did not apply, since the federal government permitted and regulated cigarette labeling and advertising.

As the *Flanagan* opinion suggests, the issue was a difficult one.[1] After analyzing a comprehensive federal regulatory scheme at issue, the Court concluded that because the

---

[1] The Court cited a commentary lamenting *Smith*'s effect on what was once "one of the broadest and most powerful consumer protection acts in the country. . . . As a result of [*Smith*], the MCPA has entered a new era. Indeed, there may be little left of the power to protect consumers that the legislature had in mind when it passed the act." Gary M. Victor, *The Michigan Consumer Protection Act: What's Left after* Smith v. Globe?, 82 Mich. B. J. 22, 23-25 (2003). The Court also agreed with the Michigan Court of Appeals's decision in *Smith* "that under 'a common-sense reading' of the MCPA, 'authorized' should not include 'illegal.'" 2005 U.S. Dist. LEXIS 24644, at *21 (quoting *Smith v. Globe Life Ins. Co.*, 565 N.W.2d 877, 884 (Mich. Ct. App. 1997), *rev'd*, 597 N.W.2d 28). But the Court recognized that "that is not the law in Michigan," and that "the Michigan courts' liberal definition of 'specifically authorized' under the MCPA's exemption provision" left very little room for consumer lawsuits under the MCPA. Recently, a panel of the Michigan Court of Appeals has "question[ed] the wisdom of . . . *Smith*," noting that it "liberally interpreted the phrase 'transaction or conduct specifically authorized' to include any activity or arrangement permitted by statute.*" Hartman & Eichhorn Bldg. Co. v. Dailey*, 701 N.W.2d 749, 753 (Mich. Ct. App. 2005), *leave granted*, 712 N.W.2d 724 (Mich. 2006).

defendant's "'general transaction' was the labeling and advertising of its cigarettes," and because federal law "'establishes a comprehensive Federal program to deal with cigarette labeling and advertising,'" the defendant's conduct was exempt from the MCPA. *Id.* at *22 (quoting 15 U.S.C. § 1331). This finding relied on a factual comparison with *Smith* and a number of other cases interpreting the MCPA exemption.

In *Smith*, the conduct at issue was the sale of credit life insurance. The court held that the conduct was protected because the defendant had, pursuant to a state statute, submitted the necessary application and certificate of insurance forms to the State Commissioner of Insurance, and had implicitly been approved for the policy. *Id.* at 36-37. In *Kraft v. Detroit Entertainment, L.L.C.*, 683 N.W.2d 200 (Mich. Ct. App. 2004), the plaintiff alleged fraud based on the deceptive use of slot machines. The court found this claim exempt because the operation of slot machines was regulated and specifically authorized by the Michigan Gaming Control Board, whose administrative rules "specifically authorized defendants to operate the slot machines at issue . . . ." *Id.* at 204-05. And in *Newton v. Bank West*, 686 N.W.2d 491 (Mich. Ct. App. 2004), the plaintiffs alleged that a bank had improperly charged mortgage fees. The court found it "abundantly clear" that banks making residential mortgage loans "are engaged in transactions 'specifically authorized' under laws administered by officers acting under both state and federal statutes." *Id.* at 493-94.

In addition to these state cases, this Court cited three federal cases decided on similar grounds. *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 720-22 (E.D. Mich. 2005) (claims based on hospital billing practice exempt because state statute governed health facility billing practices); *Mills v. Equicredit Corp.*, 294 F. Supp. 2d 903,

910 (E.D. Mich. 2003) (improper lending practices claim exempt because defendant bank "was a licensed mortgage lender under a Michigan law that was regulated by the Commissioner of the Office of Financial and Insurance Services of the Department of Consumer and Industry Services"); *Wheeling, Inc. v. Stelle*, 2000 U.S. Dist. LEXIS 8628, at *18-19 (E.D. Mich. 2000) (securities fraud claim exempt because the "sale of securities is regulated by the Michigan Uniform Securities Act, which is administered by the Corporation and Securities Bureau of the Michigan Department of Commerce").

The Court noted, however, that not every decision has favored defendants. Two pre-*Smith* cases are particularly instructive. In *Attorney General v. Diamond Mortgage Co.*, 327 N.W.2d 805 (Mich. 1982), which *Smith* distinguished but declined to overrule, 597 N.W.2d at 37-38, the defendant was a licensed real estate broker sued for conduct related to mortgage lending. The Michigan Supreme Court held the relevant conduct was "mortgage writing," which was not "specifically authorized" under the defendant's real estate broker's license, and thus was not exempt from the MCPA:

> While the license generally authorizes Diamond to engage in the activities of a real estate broker, it does not specifically authorize the conduct that plaintiff alleges is violative of the Michigan Consumer Protection Act, nor transactions that result from that conduct. . . . For this case, we need only decide that a real estate broker's license is not specific authority for all the conduct and transactions of the licensee's business.

327 N.W.2d at 811.

Another case apparently left undisturbed by *Smith* is *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727 (Mich. Ct. App. 1996), in which the Michigan Court of Appeals made clear that in order to be protected, the conduct at issue—what *Smith* termed the "general transaction"—must fall within the purview of the regulatory agency:

11

> We do not agree with defendant that it is exempt from the MCPA because it is governed by a regulatory board, the Michigan Board of Pharmacy. It is true that the MCPA does not apply to a transaction or conduct specifically authorized under laws administered by a regulatory board or officer. This exemption does not apply in this case because the alleged violative conduct falls outside the realm of the regulatory commission. Here, plaintiff is claiming that defendant's advertising . . . violates the MCPA. Advertising is not within the purview of the Pharmacy Board's regulatory powers. Therefore, plaintiff's claim that defendant's advertising . . . violates the MCPA falls outside the realm of the regulatory commission and . . . the MCPA does not apply.

*Id.* at 732 (internal citations omitted).

These cases demonstrate that while *Smith* unquestionably broadened the MCPA's exemption for conduct authorized by a government agency, it did not abrogate the statute entirely. Even if a defendant is licensed or regulated, it may remain liable under the MCPA for conduct outside the scope of its license or the pertinent regulations. In other words, "specifically authorized" does not simply mean "not prohibited." To conclude otherwise would be to create a gap in enforcement in those areas not covered by government regulation.

Applying these principles to the present case, the Court must determine what the "general transaction" was. Defendant argues, "The general transaction at issue here—the provision of wireless communications services—is subject to comprehensive federal regulation." (Br. of Def. 17.) Defendant essentially makes the same argument as the defendant pharmacy in *Baker*, which sought protection for all of its conduct pursuant to regulation by the Michigan Board of Pharmacy, though advertising fell outside of the Board's authority. Just as in *Baker*, Defendant's description is far too broad.

Plaintiff, on the other hand, states that he "is not complaining about the reasonableness of the rates charged by Defendant—a subject clearly preempted by the

Federal Communications Act—but rather Defendant's deception and failure to provide the benefits promised." (Br. of Pl. 21 n.6.) Plaintiff therefore wishes to describe the pertinent transaction simply as Defendant's wrongful acts, but as the court in *Smith* explained, the focus is not on the "specific misconduct alleged," but on the "general transaction." 597 N.W.2d at 38. Thus, Plaintiff also misses the mark.

In truth, several general transactions take place under the umbrella of providing cellular services, but this case concerns only one: billing. Plaintiff alleges that Defendant double-billed him for a service he had already paid for. The Court must therefore determine whether Defendant's billing practices are "specifically authorized."

In arguing that they are, Defendant cites the Federal Communications Act, which asserts federal control over all interstate radio communications. *See* 47 U.S.C. § 151 *et seq.* Defendant also cites the Federal Communications Commission's "pervasive body of regulations governing virtually every aspect of wireless communications" (Br. of Def.18), such as cellular service requirements, geographic coverage, emissions, and licensing requirements. *See* 47 C.F.R. § 22.901, 22.911, 22.913, 22.917, 22.929. While these regulations are extensive, none of them govern the billing practices of cellular telephone companies.

More persuasively, Defendant notes that a federal statute requires that charges for any radio-based communications be reasonable. *See* 47 U.S.C. § 201, 202. Furthermore, the FCC has created the Wireless Telecommunications Bureau, which "develops, recommends and administers the programs and policies for the regulation of the terms and conditions under which communications entities offer domestic wireless telecommunications services . . . ." 47 C.F.R. § 0.131. Among its duties, this bureau

"[r]egulates the charges, practices, classifications, terms and conditions for, and facilities used to provide, wireless telecommunications services." 47 C.F.R. § 0.131(d). Thus, according to the regulations that Defendant cites, the FCC appears to take an active role in regulating cellular telephone contracts.

Plaintiff takes issue with this characterization, however, and offers a wealth of authority painting a much different picture. In 1993, for example, the Federal Communications Act's preemption provision was amended to provide that while state and local governments may not regulate the rates charged for cellular telephone service, the Act "shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A). The FCC itself has interpreted this section as follows:

> We do not agree . . . that state contract or consumer fraud laws relating to the disclosure of rates and rate practices have generally been preempted with respect to [cellular providers]. Such preemption by Section 332(c)(3)(A) is not supported by its language or legislative history. . . . [T]he legislative history of Section 332 clarifies that billing information, practices and disputes—all of which might be regulated by state contract or consumer fraud laws—fall within "other terms and conditions" which states are allowed to regulate. Thus, state law claims stemming from state contract or consumer fraud laws governing disclosure of rates and rate practices are not generally preempted under Section 332.

*In re Southwestern Bell Mobile Systems, Inc.*, 14 F.C.C.R. 19898, 19908 (Nov. 24, 1999) (footnotes omitted). The FCC's consumer information website also makes clear, in its "commonly asked questions" section, that it does not regulate contractual matters between providers and customers:

> I'm having billing problems with my cellular provider; who can help me?
>
> The FCC does not regulate contractual arrangements with cellular providers, but does handle complaints about wireless service.

14

FCC Consumer & Governmental Affairs Bureau, http://www.fcc.gov/cgb/cellular.html.

Another federal district court, applying the Connecticut Unfair Trade Practices Act, found that

> the Federal Communications Act expressly reserves to the states the ability to regulate "terms and conditions of commercial mobile services" other than their rates. 47 U.S.C. § 332(c)(3)(A). Therefore . . . , there is no alternative statutory scheme, either in Connecticut or at the federal level, to govern the non-rate setting business practices of [cellular] carriers.

*In re Conn. Mobilecom, Inc.*, 2003 U.S. Dist. LEXIS 23063, at *15-16 (S.D.N.Y. Dec. 23, 2003).

Although this case is tangentially related to Defendant's rates, and state regulation of rates is preempted, 47 U.S.C. § 332(c)(3)(A), Plaintiff does not contest those rates generally. Rather, Plaintiff contends that Defendant double-billed him for a service he had already paid for. Thus, as described above, this is a dispute over Defendant's billing practices, an area over which the FCC has expressly arrogated to the states through laws such as the MCPA.

The "general transaction" at issue here was not "specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a); *Smith*, 597 N.W.2d at 38. Therefore, Defendant's alleged misconduct is not exempt from the MCPA.

### III. Conclusion

This case illustrates the importance of both the Michigan Consumer Protection Act and its class action mechanism. Because the class action waiver in Defendant's contract prevents the effective vindication of Plaintiff's statutory rights under the MCPA, it is

unenforceable. The parties have agreed that upon such a finding, this case shall not be subject to arbitration.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby DENIES Defendant's Motion to Compel Arbitration.

                                      s/Nancy G. Edmunds
                                      Nancy G. Edmunds
                                      United States District Judge

Dated: July 20, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 20, 2006, by electronic and/or ordinary mail.

                                      s/Carol A. Hemeyer
                                      Case Manager